AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20) ☐ Original ☐ Duplicate Original

LODGED
CLERK, U.S. DISTRICT COURT
09/03/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: AP DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
09/03/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: rec DEPUTY

United States of America,

v.

Louis White,

Defendant(s)

Case No. 5:26-mj-00643

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date(s) of August 26, 2026 in the county of Riverside in the Central District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 876 | Mailing Threatening Communications |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Gabriel Rodriguez
*Complainant's signature*

Gabriel Rodriguez, Postal Inspector
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: September 3, 2026

*Judge's signature*

City and state: Los Angeles, California

The Hon. David T. Bristow, U.S. Magistrate Judge
*Printed name and title*

AUSA: Barr Benyamin (x6772)

# AFFIDAVIT

I, Gabriel Rodriguez, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Louis George WHITE ("WHITE") for a violation of 18 U.S.C. § 876: Mailing Threatening Communications.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Riverside County Sheriff's Department, in Murrieta, California, as described more fully in Attachment A:

1. A black Samsung cellphone in a green case ("**SUBJECT DEVICE 1**");

2. A laptop found on a living room couch in WHITE's residence and given evidence barcode 2814499 by the Riverside County Sheriff's Department ("**SUBJECT DEVICE 2**").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of18 U.S.C. § 876 (Mailing Threatening Communications) (the "Subject Offense"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a Postal Inspector ("PI") with the United States Postal Inspection Service ("USPIS") and have been so since February 2016. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I am currently assigned to the Contraband Interdiction and Investigations ("CI2") East Team of the Los Angeles Division, which is responsible for investigating drug trafficking involving the United States Mail. I am also a Dangerous Mail Investigations Inspector, trained in the investigation of criminal offenses related to hazardous materials, explosive devices, and threatening communications transported through the U.S. Mail system.

6. I graduated from the USPIS's Federal Law Enforcement Training Academy in Potomac, MD. In addition, I have received extensive narcotics training and have experience investigating violations of federal narcotics and money laundering laws. I have been involved in various electronic surveillance methods, and the debriefing of informants, witnesses, and others who have

knowledge of the manufacturing, distribution, transportation, storage, and importation of controlled substances, and the laundering of drug proceeds. I have participated in many aspects of drug investigations, including investigations into the smuggling of illegal drugs and money laundering. I am familiar with narcotics traffickers' methods of operation, including the manufacturing, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am familiar with how drug traffickers use counter-surveillance techniques to avoid detection by law enforcement.

## III. SUMMARY OF PROBABLE CAUSE

7. On or about August 28, 2026, I was contacted by Investigator Pierce Roberts of the Riverside County Sheriff's Department (the "RSO") in Murrieta, CA. Investigator Roberts reported a hate/threatening letter that was mailed to and received by the Islamic Center of Temecula Valley ("ICTV"), a Mosque in Temecula, CA, located in the Central District of California. The letter included threats of perpetrating a mass killing of Muslims.

8. Investigator Roberts sought assistance identifying the source of the letter. Using postal business records and databases, the USPIS was able to identify that the letter was processed through the San Bernardino Processing and Distribution Center in Redlands, CA, or about July 30, 2026. This meant the letter originated from either San Bernardino County or Riverside

County. Investigator Roberts sent the letter and envelope in which the letter was sent to a forensics laboratory for fingerprinting. A print was found on the letter belonging to WHITE. Investigator Roberts obtained an arrest warrant for WHITE and a search warrant for WHITE's residence.

9. On August 29, 2026, WHITE was arrested and **SUBJECT DEVICE 1** was seized from his person. WHITE was later interviewed and confessed to sending the letter through the mail and expressed animosity towards Muslims. During a search of WHITE's residence, several firearms were discovered and seized by the RSO. At least one of these is believed to be an AR15-style short-barreled rifle with no serial number (i.e., a ghost gun) that was loaded with ammunition. Another of the firearms is believed to be a short-barreled rifle. Officers also seized **SUBJECT DEVICE 2** during the search of WHITE's residence.

## IV. STATEMENT OF PROBABLE CAUSE

10. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. WHITE Mails a Threatening Letter to the Islamic Center of Temecula Valley

11. On or about August 26, 2026, Jamal Rakouki, a Board Member for the ICTV, called the RSO to report a threatening letter received by the mosque. The letter stated:

To whom it may concern . . . .

> I CANNOT WAIT FOR THE DAY TO KILL EVERY ONE OF YOU, IT CANNOT COME SOON ENOUGH!
>
> FUCK YOU ALL!!!

Under the text was a drawing of an aiming reticle containing a bearded face with X's for eyes and wearing a hat stating "FUCK ALLAH." A photo of the letter is attached hereto as **Exhibit 1**.

12. RSO Deputy Duhamel, a Task Force Officer with the USPIS, responded and took a report from Rakouki. Deputy Duhamel also took possession of the threatening letter and envelope containing it for investigation.

13. On or about August 28, 2026, RSO Inspector Roberts contacted the USPIS for assistance in this case. I responded to Investigator Roberts' call and reviewed images of the threatening letter and noticed a barcode on the back of the envelope. This barcode is called an ID tag. Through this ID tag, and with the assistance of USPIS Program Manager Landen Hawkins, I determined the letter was processed at the San Bernardino Processing and Distribution Center in Redlands, CA, or about July 30, 2026. Based on training and experience, this meant the letter originated from San Bernardino County or Riverside County. Because letter mail is not heavily tracked within USPS systems, all law enforcement could ascertain from this is that the letter was mailed from either San Bernardino County or Riverside County. Inspector Roberts then sent the threatening letter and envelope to the RSO forensic laboratory for fingerprint analysis.

14. On August 28, 2026, RSO CAL-ID Forensic Print Examiner Samantha Rainer notified Investigator Roberts that a latent print was recovered from the back of the threatening letter. Fingerprint analysis identified the fingerprint as belonging to WHITE. Investigator Roberts conducted subsequent background and Department of Motor Vehicle checks, which revealed WHITE maintains a primary address in Warner Springs, CA,[1] and has two vehicles registered to that address. Investigator Roberts conducted a records check and found that WHITE had multiple firearms registered to him.

**B. Geo Location Warrant, Search Warrant, and Arrest of WHITE**

15. On August 28, 2026, Investigator Roberts' investigative leads further identified cellular telephone number (562) 397-7199 as being actively used by WHITE ("WHITE's Cellphone). The same day, Investigator Roberts conducted a pretext phone call to WHITE's Cellphone. An adult male answered the line. When Investigator Roberts asked if it was Louis White on the line, the male confirmed his identity by stating, "Yeah."

16. The same day, Investigator Roberts authored a Geo Location warrant for WHITE's Cellphone, which was authorized by the Honorable Francisco Navarro, Superior Court Judge of the County of Riverside. Investigator Roberts received data that placed WHITE on that day around his residence located at 35310 Peralta Dr., Warner Springs, CA 92086 (the "WHITE Residence").

---

[1] Warner Springs is in San Diego County.

This residence is east of Temecula, CA, i.e., where the ICTV is located.

17. On August 29, 2026, at approximately 1:00 p.m., RSO deputies conducted a traffic stop on WHITE in the area of 30270 CA-78, Santa Ysabel, CA 92070. WHITE was driving a gray Tesla X with CA License Plate 9UPX503. WHITE was subsequently taken into custody pursuant to the arrest warrant and **SUBJECT DEVICE 1** was seized from his person.

18. During the search of the WHITE Residence pursuant to a search warrant, the RSO located 15 firearms. One of the firearms, an AR-15-style rifle with no serial number, based on training and experience, is a suspected short-barrel rifle and a "ghost gun," and is being reviewed by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). Another one of the firearms, an TPM Arms AR-15 rifle, based on training and experience, is a suspected short-barreled rifle and is being reviewed by the ATF. The RSO also located inside the WHITE Residence thousands of rounds of ammunition of various calibers and a baseball cap that read "Shoot your local terrorist".

19. During the search of the WHITE Residence, the RSO also located **SUBJECT DEVICE 2** on the living room couch.

**C. WHITE Admits to Sending the Threatening Letter**

20. On August 29, 2026, after being arrested, WHITE was interviewed by Investigator Roberts at the RSO station in Murrieta, CA. Also present was Postal Inspector Adryel Carrillo. The interview was recorded on Investigator Roberts' body-worn camera. WHITE was read his <u>Miranda</u> rights and agreed

to speak to the interviewers. During the interview, WHITE admitted to mailing the threatening letter to the ICTV. WHITE made several other inflammatory and discriminatory statements towards Muslims, stating "It's not good" when specifically asked by Investigator Roberts about Muslims. WHITE also told investigators that he has been banned from Facebook for using profanities, swearing, and speaking his mind online.

21. During the interview, WHITE signed a search consent form for his cellphone (i.e., **SUBJECT DEVICE 1**) and provided officers with his passcode. Together with WHITE, officers looked through WHITE's Facebook account and found several anti-Muslim posts WHITE had made, including a post that stated "Fukc Muslims and Fukc Islam," and a post that stated "Muslims need to be exterminated from Earth." Also, during the interview, WHITE spoke about Muslims taking over America and killing Americans. At one point, WHITE asked Investigator Roberts "What are you gonna do about it?" Investigator Roberts in turn asked WHITE what he was going to do about it. WHITE responded, "I can't do anything now that you took my guns!"

## V. TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES

22. Based on my training and experience, I know that individuals who commit bias-motivated offenses or who conspire with others to commit crimes based on shared bias or ideology use cell phones, other electronic devices, e-mail, and social media to research and conduct their illegal activities, to preserve and distribute photographs and videos in order to memorialize previous illegal activity and advance their social

and ideological agenda, and to maintain contact with other confederates, conspirators, and criminal associates involved with the planning, targeting, and execution of their goals. These goals can include, espousing violence, making threats online, recruiting like-minded individuals to their activities, and committing acts of violence that target individuals who are seen as anathema to their shared ideology or social agenda.

23. In addition, I know through my training and experience that individuals who commit bias-motivated offenses or who conspire with others to commit crimes based on shared bias or ideology use various symbols, slogans, and paraphernalia that they often maintain in their homes, vehicles, and on their person. They can distribute these symbols, slogans, and paraphernalia in the public square, post online, or wear them in the form of clothing or jewelry. Such individuals will also use banners, flags, and posters to publicly advertise their social and ideological goals and/or to use as a recruitment tool. Evidence of these items is often maintained in the individuals' homes, in their vehicles, on their person, and/or on their digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

24. As used herein, the term "digital device" includes the SUBJECT DEVICES.

25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

26. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

27. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

28. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

29. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress WHITE's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of WHITE's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

32. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

33. For all of the reasons described above, there is probable cause to believe that WHITE has committed a violation of 18 U.S.C. § 876: Mailing Threatening Communications.

34. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 3rd day of September, 2026.

THE HON. DAVID T. BRISTOW,
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1



To whom it may concern....

I CANNOT WAIT FOR
THE DAY TO KILL EVERY ONE
OF YOU, IT CANNOT COME
SOON ENOUGH!
FUCK YOU ALL!!!...